HERITAGE HOUSE OF SALEM, INC.,
et al., Appellants–Plaintiffs,

Heritage House of Clinton, Inc., Heritage
House of Connersville, Inc., Appellants–
Intervening Plaintiffs,

v.

John C. BAILEY, Commissioner of the
Indiana Department of Health, et
al., Appellees–Defendants,

United Health, Inc., et al., Appellees–
Intervening Defendants.

No. 88A01–9410–CV–348.

Court of Appeals of Indiana.

June 12, 1995.

Rehearing Denied Aug. 22, 1995.

David F. McNamar, Randall R. Fearnow, Janet A. McSharar, Alastair J. Warr, McNamar Fearnow & McSharar, P.C., Indianapolis, for appellants.

Pamela Carter, Atty. Gen., Jon Laramore, Deputy Atty. Gen., Brian W. Welch, Paul R. Black, Brian K. Peters, McHale Cook & Welch, Indianapolis, for appellees.

## OPINION

BAKER, Judge.

The primary issue for resolution in this case is whether the State of Indiana has the authority to control the number of beds in a nursing institution that are certified under Title XIX of the Social Security Act (Medicaid Act). Appellants-plaintiffs Heritage House of Salem, Inc., (Salem) and appellants-intervening plaintiffs Heritage House of Clinton, Inc., (Clinton) and Heritage House of Connersville, Inc., (Connersville) (collectively Heritage House) claim that Indiana's Certificate of Need (CON) Program, which is the process by which the state certifies only a certain number of beds in a nursing institution for Medicaid participation based on the needs of the county in which the institution is located, violates federal law. Specifically, Heritage House argues that federal law prohibits certifying less than all of the nursing beds in an institution for participation in the Medicaid Program. Appellees-defendants John C. Bailey, the commissioner of the Indiana Department of Health, et al.[1] (collectively IDH) and appellees-intervening defendants United Health, Inc., et al.[2] (collectively United Health), counter that the Medicaid Act specifically contemplates partial certification of a nursing institution.

Medicaid was established in 1965 as a part of the same legislative package that included Medicare, the federal health insurance program for the elderly. Medicaid, established under Title XIX of the Social Security Act, is the principle payor of nursing home care in the United States. *Dep't of Pub. Welfare v. Lifelines of Ind.* (1994), Ind.App., 637 N.E.2d 1349, 1351, *trans. denied.* Congress created the Medicaid program to enable participating states to obtain federal financial assistance in caring for the medical needs of the states' needy. *Id.* The program is regulated by the states, although funded jointly by the states and the federal government. *Id.* While participation in the program is voluntary, a state must present a state Medicaid plan for the Department of Health and Human Services' approval in order to obtain federal funding.

### FACTS

Salem, Clinton, and Connersville are nursing homes that are certified, pursuant to

---

1. The other defendants in this case are the Indiana Department of Health, the Indiana Health Facilities Council (IHFC), the Indiana Family and Social Services Administration (IFSSA), Jeff Richardson, secretary of IFSSA, and James Verdier, the Director of IFSSA.

2. The other intervening defendants are the Hillhaven Corporation, Van Ness, Spaugh & Smith, Inc., DHE, Inc., and Houston Development, Inc. All of these corporations operate nursing institutions in the State of Indiana.

IND.CODE § 16–10–4–9.1 [3], by IDH to provide nursing care for patients who are eligible for Medicaid. Through the Medicaid Act, pursuant to 42 U.S.C. § 1396a, these institutions are reimbursed when they provide nursing care to Medicaid eligible patients. However, a nursing institution can only receive Medicaid reimbursement from the State when a Medicaid eligible patient receives care while residing in a Medicaid certified bed. In other words, the institutions do not receive any aid from the State for Medicaid eligible patients who occupy non-certified beds.

In each of these nursing homes, only a certain number of beds have been certified for Medicaid participation. For example, Salem initially requested and obtained Medicaid certification for 64 of its 100 beds. Thereafter, Salem observed that several of its patients who were occupying non-certified beds were spending down their assets and, thus, becoming eligible for Medicaid assistance. However, Salem did not have any vacant Medicaid certified beds into which those patients could be moved. Thus, Salem realized that it would soon be in a situation in which it would either have to continue caring for the Medicaid eligible patients without receiving Medicaid reimbursement because the patients resided in non-certified beds, or discharge those patients and relocate them to facilities that had Medicaid certified beds available. Rather than discharging the patients, on March 24, 1992, Salem filed an application for certification requesting that IDH certify all 100 of its beds for Medicaid participation. IDH did not take any action on Salem's application because, although the CON Program existed under I.C. § 16–10–4–9.1, no rules had been enacted for implementing the program.[4] As a result, on January 13, 1993, Salem filed a complaint against

IDH alleging that Indiana's CON Program was inconsistent with federal law and seeking declaratory and injunctive relief to allow Medicaid eligible patients to remain at Salem and to prohibit IDH from denying Salem Medicaid reimbursement. On March 10, 1993, Salem filed a motion to certify a class action in which it sought to represent all licensed and certified long term care health facilities in the State of Indiana seeking participation in the Medicaid program.

On June 1, 1993, Salem filed an amended complaint adding Henry and Gretna Elliott as plaintiffs. The Elliotts are residents of Salem who had depleted their assets to a level at which they became eligible for Medicaid assistance. However, Salem, which had empty non-certified beds, had no Medicaid certified beds that were available. Thus, because Salem had no additional certified beds, the Elliotts were facing discharge from Salem and relocation to another nursing institution. Since their relatives visited almost daily, the Elliotts did not want to be relocated.

In response to the impending situation facing the Elliotts, on June 1, 1993, along with its amended complaint, Salem filed a motion for a temporary restraining order and preliminary injunction to ensure that the Elliotts would not be discharged from Salem and relocated to another nursing institution. On that same day, the trial court issued a temporary restraining order and scheduled a hearing on the preliminary injunction. On July 19, 1993, the trial court denied Salem's motion for class certification but entered a preliminary injunction enjoining IDH from relocating any Medicaid eligible patients or denying reimbursement to Salem for treating Medicaid eligible patients.[5] Record at 172, 724–25.

3. Effective July 1, 1993, I.C. §§ 16–10–4–9.1 to 9.3 were recodified at IND.CODE §§ 16–29–1–1 to 16–29–5–1.

4. I.C. § 16–29–1–13 requires that the IHFC adopt rules under IND.CODE § 4–22–2 to implement Indiana's CON Program. On three occasions prior to this litigation, IDH had published rules for implementing the CON Program; however, these rules never became final. The rules published at 13 Ind.Reg. 733 (Jan. 1990) were withdrawn after public hearing and the proposed

rules at 14 Ind.Reg. 1312 (March 1991) were not approved by the Governor. Further, the proposed rules at 16 Ind.Reg. 166 (Oct. 1992) were withdrawn because of the possibility that the rules would be inconsistent with pending legislation that was likely to be enacted.

5. On August 19, 1993, the trial court granted Heritage House of Connersville and Heritage House of Clinton's motion to intervene as plaintiffs. Therefore, for the remainder of this opin-

On June 11, 1993, United Health, which operates several nursing institutions in Indiana, filed a motion to intervene as plaintiffs. Subsequently, the trial court permitted United Health to intervene as defendants, rather than as plaintiffs, because it found United Health's interests to be adverse to those of Heritage House. R. at 708.

On August 9, 1993, Heritage House filed a motion for summary judgment alleging that Indiana's CON Program was violative of federal law because it allowed for partial certification of nursing institutions eligible for Medicaid participation. A hearing was held on the motion on December 9, 1993. Thereafter, on March 7, 1994, the trial court entered findings of fact and conclusions of law in which it held that federal law allows for the partial certification of a nursing institution for Medicaid participation and, thus, Indiana's CON Program is not invalid. Further, the court ordered IDH and IHFC to adopt rules implementing the CON program. Finally, the court concluded that federal law does not prohibit a nursing institution from discharging a patient that becomes Medicaid eligible when the institution does not have a Medicaid certified bed available. However, the court found that in the present case, discharging the Elliotts would be grossly unfair since IDH and IHFC had yet to enact rules implementing the CON program. Thus, the court continued the preliminary injunction until IDH complied with the court's judgment and enacted the rules.[6]

On March 31, 1994, Heritage House filed a motion to correct error and an emergency motion to stay the execution of the judgment. Thereafter, on April 29, 1994, the parties entered an agreed entry extending the injunctive relief, which required IDH to continue reimbursing Heritage House for services rendered to Medicaid eligible residents in non-certified beds, until the court ruled on Heritage House's motion to correct error.

Following a hearing, on July 12, 1994, the trial court issued its order on the motion to correct error. Although the court amended some of its findings of fact and conclusions of law, the court did not alter its original holding that Indiana's CON Program did not violate federal law.

Heritage House appeals from this order. While the primary issue for resolution in this case is whether the State of Indiana has the authority to control the number of Medicaid certified beds in a nursing institution, Heritage House also claims that the trial court erred in: 1) granting United Health's motion to intervene, 2) denying Salem's motion for class certification, and 3) refusing Heritage House's request for attorney fees.

## DISCUSSION AND DECISION[7]

### I. Intervention

On June 1, 1993, United Health filed a motion to intervene as plaintiffs. In this motion, United Health sought intervention as a matter of right pursuant to Ind.Trial Rule 24(A)(2) and permissive intervention under Ind.Trial Rule 24(B). The trial court found that United Health's interests were "diametrically opposite" to those of Heritage House and permitted United Health to intervene as defendants rather than as plaintiffs. R. at 708. The trial court did not state, however, whether it was allowing intervention as a matter of right or permissive intervention.

Heritage House asserts that the trial court erred in granting United Health's motion for intervention. Because the court did not specify which type of intervention it was allowing, we review whether intervention was appropriate under either T.R. 24(A)(2) or 24(B).

 The trial court's determination on a motion to intervene is reviewed for an abuse of discretion. *State Ex Rel. Prosser v. Ind. Waste Sys.* (1992), Ind.App., 603 N.E.2d 181, 187. In reviewing the trial court's exercise of discretion, the facts alleged in the motion must be taken as true. *Id.* Intervention as

---

ion, we refer to the three nursing institutions collectively as Heritage House.

**6.** The rules implementing the CON program were subsequently adopted and can be found at 17 Ind.Reg. 2159 (June 1, 1994).

**7.** Oral argument was heard in this case in Indianapolis on May 8, 1995.

a matter of right, pursuant to T.R. 24(A)(2), is based upon a three part test. The intervenors must show: 1) an interest in the subject of the action, 2) disposition in the action may as a practical matter impede protection of that interest, and 3) representation of the interest by existing parties is inadequate. *Developmental Disabilities v. Metro. Dev. Comm'n* (1983), Ind.App., 455 N.E.2d 960, 963–64. The determination of whether a particular factual situation satisfies the tests of T.R. 24(A)(2) is committed to the discretion of the trial court. *Id.* at 964.

Heritage House asserts that United Health was not entitled to intervene as a matter of right because it failed to demonstrate that it had an interest in the subject matter of the action. Specifically, it argues that United Health failed to show that the validity of the CON Program would impact the operation of their nursing facilities in Indiana. We disagree.

■ United Health and the other intervening corporations owned 29 nursing homes in Indiana. Some of these nursing homes had only a portion of their beds certified for Medicaid participation. United Health and the other owners did not want all of the beds in their institutions to be Medicaid certified because the Medicaid reimbursement rates were less than the actual care costs. Thus, when an institution provided nursing services to Medicaid eligible patients, it lost money because Medicaid did not reimburse it for the full cost of those services.

In the present case, Heritage House sought to have Indiana's CON Program rendered invalid and to require that IDH certify all beds in any qualified nursing institution participating in the Medicaid Program. Thus, if Heritage House were to prevail on the merits, IDH would have been required to certify all beds in all qualified Indiana nursing homes that sought participation in the Medicaid program, even if a particular nursing home did not want all of its beds certified for Medicaid participation. Thus, United Health and the other owners had an interest in protecting their remaining non-certified beds from becoming Medicaid certified and the litigation regarding the validity of the CON Program directly affected that interest.

*See Developmental Disabilities,* 455 N.E.2d at 964 (intervenor must claim an immediate and direct interest in the proceedings).

■ Furthermore, as to the third prong of the test for intervention as a matter of right, Heritage House suggests that United Health's interests in the case were adequately protected by IDH, and thus, there was no need for intervention. However, IDH is the regulator of nursing facilities in the state. With the state budget in mind, IDH seeks to contain the costs of health care. In contrast, private nursing institutions seek financial gain. Their main interest is in defraying the loss that they incur as a result of treating Medicaid patients. Hence, by definition these entities have different interests and IDH is not an adequate representative of United Health's interests. Therefore, since United Health had direct interests in the case which were not adequately protected by IDH, United Health was entitled to intervention as a matter of right.

■ In regard to permissive intervention pursuant to T.R. 24(B), it is well settled that where the effect of granting a motion would be to open up new areas of inquiry or raise unrelated issues, the motion should be denied. *Cromer v. Sefton* (1984), Ind.App., 471 N.E.2d 700, 704. Heritage House contends that United Health's primary purpose in intervening was to interject new issues into the case. Specifically, they point out that United Health sought relief in the form of a mandamus requiring IDH to promulgate rules for administering the CON Program when this issue was not before the court. Heritage House is mistaken.

■ The mandamus sought by United Health was a suggestion as to the appropriate remedy in the case. It was not a new issue. Since United Health presented no new issues, it was entitled to permissive intervention. Accordingly, United Health was entitled to intervention pursuant to either T.R. 24(A)(2) or 24(B), and the trial court did not abuse its discretion in granting intervention.

## II. Class Certification

Next, Heritage House contends that the trial court erred in denying Salem's motion for class certification pursuant to Ind.Trial Rule 23. In its motion, Salem sought to represent the class of Indiana certified long term care health facilities qualifying for participation in Indiana's Medicaid Program.

■ When reviewing the trial court's ruling on a motion for class certification made pursuant to T.R. 23, this court employs an abuse of discretion standard of review. *Am. Cyanamid Co. v. Stephen* (1993), Ind.App., 623 N.E.2d 1065, 1070. T.R. 23 has two sets of requirements which must be satisfied in order for an action to proceed as a class action. *Id.* The first set of requirements are set forth in T.R. 23(A) which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

All of the requirements of T.R. 23(A) must be satisfied before class certification is appropriate. *Id.* at 1071.[8]

■ With scant recitation to authority, Heritage House argues that it satisfied all four of the requirements of T.R. 23(A). It specifically argues that its claims are typical of the claims of all certified long term care health facilities in the State of Indiana which seek participation in the Medicaid Program. However, as IDH and United Health clearly point out in their respective appellate briefs, the relief Heritage House sought was contrary to that sought by a number of nursing institutions in Indiana. Heritage House sought to have Indiana's CON Program rendered invalid while United Health, which

represented 29 nursing institutions certified under the Medicaid Program, and the Indiana Health Care Association, a trade association representing a majority of long term care facilities in the state, were in favor of the CON program and opposed Heritage House's efforts to have the program deemed invalid. Therefore, Heritage House's claims were not typical of the claims of all certified long term care health facilities in the State of Indiana. Because Heritage House's interests were adverse to the interests of some of those it sought to represent, the trial court's denial of class certification was appropriate.

## III. Validity of Indiana's CON Program

### A. Standard of Review

■ Heritage House contests the trial court's denial of its motion for summary judgment and the grant of summary judgment in favor of IDH. Specifically, Heritage House challenges the court's findings that Indiana's CON Program does not violate federal law. In granting the motion for summary judgment, the trial court entered findings of fact and conclusions of law many of which Heritage House claims are erroneous. We note that normally the requested entry of specific findings and conclusions triggers the appellate standard of review contained in Ind.Trial Rule 52. However, that rule governs only those cases which proceed to trial, not those cases disposed of in summary proceedings. *P.M.S., Inc. v. Jakubowski* (1992), Ind.App., 585 N.E.2d 1380, 1381, n. 1. The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. *Id.* Thus, in the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.* Hence, we employ our usual standard of review for cases disposed of by summary judgment.

---

8. Since we find that Heritage House failed to prove one of the requirements of T.R. 23(A), namely that its claims were not typical of those it sought to represent, we need not reach the second set of requirements for class certification under T.R. 23(B).

■■■ A trial court's grant of summary judgment arrives on appeal clothed with a presumptive validity. *Briar v. Elder–Beerman Dep't Store, Inc. & Design in Mind, Inc.* (1994), Ind.App., 645 N.E.2d 8, 10, *trans. denied.* A court on appeal stands in the same position as the trial court when reviewing a summary judgment motion. *Id.* at 11. Summary judgment shall be granted if the designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C).

*B. Does the State of Indiana Have the Power to Limit the Number of Medicaid Certified Beds in a Nursing Institution?*

Heritage House requests that we reverse the trial court's grant of summary judgment in favor of IDH as well as its findings and conclusions to the extent that they approve of Indiana's CON Program. Specifically, Heritage House contends that Medicaid certification takes place between the institution seeking participation in the program and the federal government. Thus, the state has no authority to interfere with that process by limiting the number of Medicaid certified beds in an existing nursing institution.[9] On the other hand, IDH and United Health argue that federal statute allows the state to control the number of Medicaid certified beds in a county. We agree with IDH and United Health.

■■ Although federal law does not require states to adopt CON programs, it does encourage states to do so. In fact, Indiana's CON Program was enacted in furtherance of the cost-containment purposes of 42 U.S.C. § 1320a–1.[10] This federal statute is designed to assure that federal funds appropriated under the Medicaid Act are not used to support unnecessary capital expenditures made by or on behalf of health care facilities which receive Medicaid reimbursement.[11] 42 U.S.C. § 1320a–1(a). The purpose of the federal cost-containment statute is to support local health planning efforts and to encourage rational health planning by the states. *See Greenbriar Nursing Home, Inc. v. Pilley* (1994), La., 637 So.2d 429, 431.

Under Indiana's CON Program[12], before a CON can be issued, the IHCF must make a finding that the certification of additional nursing beds in the county is necessary. The council's decision on whether a CON should be issued is based primarily on the need for new nursing home beds or new Medicaid certified nursing home spaces in the county. I.C. § 16–10–4–9.1(d).[13] Information about the need for new beds and Medicaid spaces comes primarily from IDH's survey of health needs, which IDH is mandated to perform on

---

9. Heritage House concedes that the state has the power to control the construction of new Medicaid certified beds by limiting the construction of new institutions. Heritage House's only contention is that the state cannot limit the number of certified beds in existing institutions.

10. Due to the fact that Medicaid costs have been rising in an uncontrolled manner over the last twenty years, cost containment has become a major concern. Throughout the 1980's, Medicaid spending increased approximately 10 percent annually. *See* John K. Iglehart, *Health Policy Report, The American Health Care System: Medicaid* 328 The New England Journal of Medicine No. 12 (Mar. 25, 1993). In 1990, it increased 19 percent and in 1991 spending increased 32 percent. In 1980, the net federal and state expenditures of the Medicaid Program were 24 billion dollars. In 1990, that amount had increased to 68.7 billion dollars and by 1992 the net expenditures were 114.5 billion dollars.

11. Although the grant for funding for the program has been removed, the statute itself has not been repealed and several states, including

Indiana, have retained their CON Programs for cost-containment purposes.

12. Heritage House argues throughout its appellate brief that Indiana's CON program is not an effective method for containing costs and thus, it should be invalidated. However, the proper place for such an argument is before the legislature, not this court. *See State v. Rendleman* (1992), Ind., 603 N.E.2d 1333, 1334 (legislature has wide latitude in determining public policy and court shall not substitute its belief as to the wisdom of a particular statute for that of the legislature). We note that there is a Sunset provision in the statute which provides that it expires every two years. In 1994, the Indiana legislature repassed the statute. Thus, we assume that the debate about whether CON is an accurate cost-containment method was held before our General Assembly.

13. Now I.C. § 16–29–1–3.

an annual basis. I.C. § 16–1–3–4–3.[14] Further, the process that a facility goes through in applying for a CON is competitive in nature. Nursing homes try to show that they deserve additional Medicaid certified beds because they will deliver high-quality, low-cost services. I.C. § 16–10–4–9.1(d).[15]

Thus, Indiana's CON Program is not violative of federal law, but was enacted in furtherance of the federal cost-containment statute. Further, we note that the HCFA, which is the federal agency that administers the federal Medicaid Act, has never ruled that Indiana's CON Program is not in compliance with federal law. 42 C.F.R. § 430.10. In fact, HCFA has interpreted the Medicaid Act as permitting certification of a part of an institution. The record in this case contains a letter from the HCFA which states:

> Federal policy allows a facility to be partially certified under Medicaid. In a partially certified facility, a private pay individual occupying a bed within a non-certified distinct part, who exhausts his or her funds and becomes eligible for Medicaid, may be discharged if a bed is not available in the Medicaid certified section.

R. at 357. The ultimate authority for the interpretation of a statute is the administrative agency responsible for its implementation and administration. *F.L.R.A. v. U.S. Dep't of Veterans Affairs,* 958 F.2d 503, 507 (2nd Cir.1992) citing *U.S. v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979). Such interpretations are entitled to substantial deference. *Id.* It is our duty, therefore, to respect the agency's construction of the statute Congress empowered it to administer, so long as that construction is reasonable. *Iran Air v. Kugelman,* 996 F.2d 1253, 1258 (D.C.Cir.1993).

In the instant case, we cannot say that the HCFA's interpretation of the Medicaid Act as allowing for partial Medicaid–certification of a nursing institution is unreasonable. Further, our state legislature has accepted the HCFA's interpretation and through the CON Program delegated to IDH the responsibility of determining the number of Medicaid certified beds a nursing institution may have based upon the needs of the county in which the institution is located. We hold that federal law permits the state to do this and Indiana's CON Program is a valid means by which the state can control health care costs.[16]

Despite this clear federal statutory support for Indiana's CON Program, Heritage House contends that partial certification is prohibited by federal law. Heritage House relies on *Linton by Arnold v. Carney by Kimble,* 779 F.Supp. 925 (M.D.Tenn.1990), for the proposition that all beds in an institution that is participating in the Medicaid program must be certified for Medicaid reimbursement. In *Linton,* the federal district court concluded that Tennessee's policy allowing Medicaid certification of less than the total number of beds in a nursing institution violated federal law. *Id.* at 933.

In response to Heritage House's arguments that federal law prohibits partial Medicaid certification of a nursing institution, IDH and United Health assert that the Medicaid Act specifically contemplates that a part of a nursing institution may be certified for Medicaid participation. In support of its contention, United Health cites 42 U.S.C. § 1396r(a) which provides that for purposes of Medicaid "the term nursing facility means an institution (or a distinct part of an institution)...." United Health posits that the term distinct part refers to the portion of a nursing institution that is determined, by a CON Program, to be needed for the care of

---

**14.** Now I.C. § 16–30–2–1.

**15.** Now I.C. § 16–29–1–14.

**16.** Heritage House also claims that partial certification of a nursing institution is illegal because federal law prohibits the involuntary discharge and relocation of Medicaid residents simply because they become eligible for Medicaid and the facility has no available Medicaid certified beds.

We disagree. Although the result may seem harsh, the HCFA has specifically stated that a Medicaid eligible patient may be discharged if a Medicaid certified bed is not available. R. at 357. Furthermore, we observe that there is no evidence in the record showing that an Indiana Medicaid recipient has ever been discharged from an Indiana nursing institution because there was no Medicaid certified bed available.

Medicaid eligible patients. Heritage House counters that the term distinct part has a different meaning. Rather than referring to a part of an institution that has patients whose care is paid for by Medicaid, Heritage House argues that the term refers to a distinct part of a larger institution which provides a different level of care.

United Health concedes that under prior law the term distinct part did refer to a distinct part of an institution that provided intermediate, as opposed to skilled, nursing care. However, in 1987, sweeping changes were made to the conditions of Medicaid participation for nursing homes. These revisions were the result of nursing home reform provisions of the Omnibus Budget Reconciliation Act of 1987, P.L. 100–203 (OBRA 87).[17] OBRA 87 abolished the distinction between intermediate and skilled care facilities. It provided for one unitary standard of care— skilled nursing care. Although OBRA 87 did away with differing levels of care, the Medicaid Act retained the language distinct part. Thus, the crux of the parties' dispute is whether the meaning of distinct part changed after OBRA 87 was enacted.

IDH and United Health posit that since OBRA 87 abolished the distinction between levels of care in nursing facilities and required a unitary standard of care for all patients, the meaning of distinct part could no longer have reference to levels of care. Rather, they contend that it can only refer to the different sources of payment for nursing services, be it private pay or Medicaid reimbursement. In other words, the term refers to a Medicaid certified distinct part of a larger nursing institution with private pay patients.

Initially, the trial court found that the term distinct part referred to the part of a nursing institution that received a different source of payment, such as Medicaid reimbursement. However, in its order on the motion to correct error, the court amended its findings and agreed with Heritage House that the term referred to differing levels of care rather than differing sources of payment. United Health cross appeals requesting that we reverse the trial court's amended finding. At the outset we note that regardless of whether today an institution can have a distinct part that provides a different level of care, the only question that concerns us in this case is whether a nursing institution can have a Medicaid certified distinct part. We find that it can.

In arriving at our decision that the term distinct part contemplates a Medicaid certified facility within a larger nursing institution, we look to federal regulations as well as to the HCFA's interpretation of the Medicaid Act. 42 C.F.R. § 483.5 provides:

'Facility' may include a distinct part of an institution.... For Medicare and Medicaid purposes, the 'facility' is always the entity which participates in the program, whether that entity is comprised of all of, or a distinct part of a larger institution.

This federal regulation establishes that an entity participating in the Medicaid program may be located within a larger nursing institution. Further, we previously referred to a letter from the HCFA which clearly states that federal policy allows for partial Medicaid certification of a nursing institution. R. at 357. In that letter, the HCFA specifically references a situation in which a private pay patient occupies a bed in the non-certified distinct part of an institution and when that individual becomes eligible for Medicaid assistance, the patient may be transferred to a bed in the Medicaid certified section of the same institution provided that there is an available bed in that section. Moreover, in § 2110 of the HCFA State Operations Manual states:

A distinct part of an institution may, at the provider's election, participate as a SNF under title XVIII [Medicare Act], title XIX [Medicaid Act], or both. The participating area does not have to include all parts of the institution rendering SNF services. For example, an institution consisting of SNF wings A and B plus hospital wing C

---

**17.** United Health asserts that *Linton,* the case relied upon by Heritage House, is not controlling because the *Linton* decision was based upon prior law which was substantially changed after OBRA 87. We agree and further note that there are also many factual and theoretical differences between *Linton* and the present case.

may elect to have only wing A participate as a distinct part SNF. Furthermore, it may elect to have wing A participate as a title XVIII SNF and wing B participate as a title XIX SNF ... an institution may make this choice on the basis of a presumed reimbursement advantage.

Supp.App. at 7.

Thus, an institution may have a Medicaid certified distinct part and the decision whether to seek certification of the entire institution or just a part thereof is left to the institution. Heritage House admitted at oral argument that the Medicaid reimbursement rates are less than actual care costs. Therefore, nursing institutions tend to lose money when they provide nursing services to Medicaid patients. As a result, in order to protect their fiscal integrity, nursing institutions must maintain a certain ratio of private-pay and Medicaid patients. R. at 580. Based upon an institution's need to defray the losses occasioned by caring for Medicaid patients, an institution may apply for Medicaid certification of a certain number of its beds. However, the ultimate decision on how many of those beds will become Medicaid certified is made by IDH based on the needs of the county in which an institution is located. We note that if we were to accept Heritage House's contentions and rule that a state cannot limit the number of beds in an institution, the ramifications would be detrimental. For example, a nursing institution could find itself in a situation where it was providing nursing services to a large number of Medicaid eligible patients when the institution's cost structure was set up to house only a limited number of Medicaid patients.

Finally, Heritage House asserts that 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 483.12(c) grant Medicaid eligible residents the freedom to choose the certified facility in which they wish to reside. Moreover, Heritage House argues that Indiana's CON Program limits equal access to medical care in nursing institutions and denies Medicaid eligible patients the right to freely chose their facility of choice in their county of residence. Heritage House adds that "[b]ed availability in a nursing facility hundreds of miles away is not the freedom of choice granted by federal law." Appellant's Brief at 31.

However, the record reveals that during the entire time that this case was pending there were vacant beds in Washington County. R. at 574. Thus, the Elliotts would not have been moved out of their community. Further, Heritage House acknowledges that it could now apply under the CON Program for certification of additional beds in its institution, but it has chosen not to do so. If Heritage House would simply follow the CON procedures, which we hold are valid, it would be granted certification of additional beds.[18]

In conclusion, we hold that Indiana's CON Program is not violative of federal law and the state may continue to control the number of Medicaid certified beds in its counties.

### Attorney Fees

Finally, Heritage House asserts that the trial court erred in failing to hold a hearing concerning its request for attorney fees under 42 U.S.C. § 1988. In order to obtain relief pursuant to 42 U.S.C. § 1988, a plaintiff must qualify as a prevailing party in that the plaintiff must obtain at least some relief on the merits of his claim. *Indiana Bd. of Pub. Welfare v. Tioga Pines Living Center, Inc.* (1993), 622 N.E.2d 935, 947, *cert. denied,* — U.S. —, 114 S.Ct. 1302, 127 L.Ed.2d 654. Here, Heritage House contends that it prevailed on the merits because it received a temporary restraining order which later became a preliminary injunction preventing the relocation of the Elliotts and restraining IDH from denying reimbursement to Salem for Medicaid eligible residents residing in non-certified beds. However, although Heritage House succeeded in obtain-

---

18. The record reveals that after the rules implementing the CON Program were adopted, there was a need for as many as eighteen additional Medicaid certified beds in Washington County. The only other nursing institution in that county, besides Salem, had only four uncertified beds. Thus, if at that time Salem had applied for certification of additional beds under the CON program, it definitely would have received certification of at the very least 14 of its uncertified beds. Because there is no evidence showing that the need for certified beds in Washington County has changed drastically, we assume the same is true today.

ing a preliminary injunction granted in its favor, summary judgment was subsequently granted in favor of IDH and United Health. Because Heritage House ultimately lost its case on the merits, it was not entitled to § 1988 attorney fees. Thus, the trial court's failure to hold a hearing on the matter was harmless.

The trial court's grant of summary judgment in favor of IDH and United Health is affirmed.

ROBERTSON and RILEY, JJ., concur.